POWELL et al., Appellants,

v.

HAWKINS, Appellee, et al.

[Cite as *Powell v. Hawkins*, 175 Ohio App.3d 138, 2007-Ohio-3557.]

Court of Appeals of Ohio,
First District, Hamilton County.

No. C–060685.

Decided July 13, 2007.

Daniel E. Whiteley Jr., for appellants.

Dinsmore & Shohl, L.L.P., Deborah R. Lydon, Jennifer Orr Mitchell, and Matthew S. Arend, for appellee.

MARK P. PAINTER, Presiding Judge.

{¶ 1} Medical treatment should not involve setting a patient's head on fire.

{¶ 2} But that is exactly what happened to Wanda Hisle. Hisle is the ward of plaintiffs-appellants Dorothy Elaine Powell and Pamela Pyle ("the guardians"). The guardians appeal the trial court's entry of summary judgment for defendant-appellee James R. Hawkins, M.D. Hawkins performed electroconvulsive therapy ("ECT") on Hisle in April 2001. The electrodes were attached to her head, the therapy was administered, a fire ensued, and Hisle was burned.

{¶ 3} The guardians sued Hawkins for medical negligence, and both parties moved for summary judgment. Hawkins testified that he believed that during the procedure one of the electrodes had lipped or arced—meaning that the edges of the electrode had separated from the skin—causing the fire. The trial court entered judgment for Hawkins, concluding that the guardians had not established proximate causation and that res ipsa loquitur did not apply. Because there was sufficient proof of proximate causation, the res ipsa loquitur ruling was irrelevant, and we reverse.

## I.   Prepping for the ECT

{¶ 4} Dr. Hawkins testified that (1) Hisle was prepped for the ECT procedure in the same way each time that it had been administered, (2) Hisle's skin was

either cleaned with saline or not cleaned at all, and (3) a conductive gel called Redux was used to make the electrodes adhere to the skin.

{¶ 5} Hawkins's recollection of the fire was drastically different than that of the attending nurse. Hawkins claimed that there had been a spark, followed by a small fire, which he blew out.

{¶ 6} But the attending nurse recalled that (1) as the therapy was administered, flames erupted at the right side of Hisle's head; (2) the flames reached the ceiling of the room; (3) the flames were fueled by oxygen, which was coming from the oxygen mask lying near Hisle's head and from the oxygen ports in the wall; (4) the oxygen gauges were set at the maximum setting; and (5) Hawkins smothered the flames with a towel that had been lying on Hisle's stretcher. Hisle sustained second- and third-degree burns to her face.

{¶ 7} The guardians' expert, Dr. Ronald Schouten, testified that the fire had likely resulted from either an interrupted contact or a failed contact between the electrode and the skin. The arcing caused electricity to travel over the surface of Hisle's skin from the active electrode to the passive electrode, and then to the dispersal electrode on the opposite side of the skull. As a result, the electrical current traveled over the skin or through the epidermis, and through the hair, igniting a fuel source. Schouten explained that he was not sure what the source of fuel had been, but that it was possibly hairspray, solvent, cream, ointment, or any flammable material that was on the skin. He testified that the oxygen had also been a contributing factor.

{¶ 8} In granting summary judgment for Hawkins, the trial court focused on Dr. Schouten's testimony that the arcing could have been attributable to a failure of the adhesive on the pad, inadequate skin preparation, inadequate application of the electrode, or a defective electrode, or that it could have occurred simply because the adhesive bond was only superficial. And at the time of summary judgment, he could not say with a reasonable degree of medical probability whether the fire was caused by inadequate skin preparation or by a defective electrode. The trial court also noted that Schouten had recited other potential causes for the fire and then concluded that the guardians had failed to identify any specific negligence that had proximately caused the fire and that res ipsa loquitur did not apply.

## II. Summary Judgment

{¶ 9} A summary-judgment decision is reviewed de novo.[1] And when evaluating a decision granting summary judgment, we construe the evidence in a light

---

1. See *Hollingsworth v. Time Warner Cable,* 157 Ohio App.3d 539, 546, 2004-Ohio-3130, 812 N.E.2d 976, citing *Doe v. Shaffer* (2000), 90 Ohio St.3d 388, 390, 738 N.E.2d 1243.

most favorable to the nonmoving party, in this case the guardians.[2]

{¶ 10} Here Hawkins was entitled to summary judgment if (1) there was no genuine issue of material fact; (2) he was entitled to judgment as a matter of law; and (3) it appeared that reasonable minds could come to but one conclusion when viewing the evidence in the guardians' favor, and that conclusion was adverse to them.[3]

{¶ 11} The summary-judgment standard placed the burden on Hawkins as the moving party to identify "those portions of the record that demonstrate[d] the absence of a genuine issue of material fact on the essential elements of [the guardians'] claims."[4] Once the moving party discharges that burden, the non-moving party then has "a reciprocal burden to set forth specific facts by the means listed in Civ.R. 56(E) to show that a triable issue of fact exists."[5]

### III. Establishing a Medical–Malpractice Case

{¶ 12} To establish medical malpractice, the injured party must show that the injury was "caused by the doing of some particular thing or things that a physician or surgeon of ordinary skill, care, and diligence would not have done under like or similar conditions or circumstances, or by the failure or omission to do some particular thing or things that such a physician or surgeon would have done under like or similar conditions and circumstances, and that the injury complained of was the direct and proximate result of such doing or failing to do some one or more of such particular things."[6]

{¶ 13} Though the quoted language from the Ohio Supreme Court in *Bruni v. Tatsumi* might suggest otherwise, medical-negligence actions are analyzed under a familiar framework using common-law tort principles.[7] Consequently, in medical-negligence claims, a plaintiff must generally prove the following: "[a] duty running from the defendant to the plaintiff, breach of duty by that

---

2. See *Harless v. Willis Day Warehousing Co.* (1978), 54 Ohio St.2d 64, 8 O.O.3d 73, 375 N.E.2d 46.

3. See *Hollingsworth*, supra, 157 Ohio App.3d 539, 2004-Ohio-3130, 812 N.E.2d 976, citing *Grafton v. Ohio Edison Co.* (1996), 77 Ohio St.3d 102, 105, 671 N.E.2d 241.

4. See id., quoting *Dresher v. Burt* (1996), 75 Ohio St.3d 280, 293, 662 N.E.2d 264; see also Civ.R. 56(C).

5. See id., quoting *Morris v. Ohio Cas. Ins. Co.* (1988), 35 Ohio St.3d 45, 47, 517 N.E.2d 904.

6. See *Bruni v. Tatsumi* (1976), 46 Ohio St.2d 127, 75 O.O.2d 184, 346 N.E.2d 673, paragraph one of the syllabus.

7. See *Hester v. Dwivedi* (2000), 89 Ohio St.3d 575, 578, 733 N.E.2d 1161.

defendant, damages suffered by the plaintiff, and a proximate cause relationship between the breach of duty and the damages."[8] In a medical-negligence case, expert testimony may be used to show that the defendant did not meet the standard of care and that the failure to adhere to the standard of care proximately caused the plaintiff's injury.[9]

### IV. Proximate Cause—Why Did the Electrode Separate?

{¶ 14} The parties suggested two causes of the electrode separation: Hawkins asserted that the separation could have occurred because of a manufacturing defect or a product failure (i.e., through no fault of his own); but the guardians attributed the separation to Hawkins's negligence in inadequately prepping the skin.

{¶ 15} Proximate cause is a court-imposed limitation placed on the actor's responsibility for the consequences of the actor's conduct.[10] In analyzing proximate causation, courts are required to consider multiple factors extending beyond cause and effect: In *Johnson v. Univ. Hosp. of Cleveland,* the Ohio Supreme Court, partially quoting Prosser, explained that " 'Proximate cause'—in itself an unfortunate term—is merely the limitation which the courts have placed upon the actor's responsibility for the consequences of the actor's conduct. In a philosophical sense, the consequences of an act go forward to eternity, and the causes of an event go back to the dawn of human events, and beyond. But any attempt to impose responsibility upon such a basis would result in infinite liability for all wrongful acts, and would 'set society on edge and fill the courts with endless litigation.' As a practical matter, legal responsibility must be limited to those causes which are so closely connected with the result and of such significance that the law is justified in imposing liability. Some boundary must be set to liability for the consequences of any act, upon the basis of some social idea of justice or policy.

{¶ 16} "This limitation is to some extent associated with the nature and degree of the connection in fact between the defendant's acts and the events of which the plaintiff complains. Often to a greater extent, however, the legal limitation on the scope of liability is associated with policy—with our more or less inadequately expressed ideas of what justice demands * * *."[11]

---

8. See id.

9. See, e.g., *Berdyck v. Shinde* (1993), 66 Ohio St.3d 573, 613 N.E.2d 1014.

10. See *Hester,* supra, 89 Ohio St.3d at 580, 581, 733 N.E.2d 1161.

11. (1989), 44 Ohio St.3d 49, 57, 540 N.E.2d 1370, quoting Prosser & Keeton, Law of Torts (5th Ed.1984) 264, Section 41.

{¶ 17} To prove proximate cause, medical-expert testimony must be based on probability.[12]

{¶ 18} In Hawkins's interdisciplinary progress notes, he remarked that he believed that the arc was attributable to the electrode "lipping." He testified that lipping meant that the edges of the electrode had separated from the skin. And the plaintiff's expert, Dr. Schouten, corroborated that belief.

{¶ 19} Reading the complaint in a light most favorable to the guardians, the trial court noted that Dr. Schouten's testimony could have allowed a reasonable fact finder to conclude that Hawkins had not cleaned Hisle's skin and that the failure constituted a breach of the standard of care. But in concluding that proximate causation did not exist as a matter of law, the trial court ruled that even if Hawkins had failed to clean Hisle's skin, the guardians had failed to provide evidence to a reasonable degree of medical probability that the failure had more likely than not caused the electrode separation. Not so.

{¶ 20} Hawkins presented testimonial evidence showing only that the separation *could have been* the result of an electrode or gel failure. But the issue must be further dissected to deduce the more probable or likely cause of the separation—as opposed to what speculatively could have caused the separation. And we begin our analysis by noting that there is not a scintilla of evidence in the record tending to show that the separation from the skin *was* in fact attributable to a failure or manufacturing defect either in the electrode or in the adhesive. The bare speculative assertion that the proximate cause of the fire could have been a manufacturing defect or a product failure, without any evidence testimonial or otherwise, did not make Hawkins's defense any more or less probable.

{¶ 21} But the guardians presented evidence tending to show that it was more probable that improper preparation had caused the separation of the electrode. It is axiomatic that most adhesive bonds lose viscidity when the bond is applied to an oily or unclean surface. Dr. Schouten testified that the possible causes of separation could have been: (1) adhesive failure, (2) improper skin preparation, (3) inadequate application of the electrode, (4) a failed electrode, or (5) a manufacturing defect. The trial court ruled that none of Schouten's opinions had been voiced in terms of a reasonable degree of medical probability.

{¶ 22} The admissibility of expert testimony on proximate cause is contingent on the expert's opinion as to cause being expressed in terms of probability.[13] "An event is probable if there is a greater than fifty percent

---

**12.** See *State v. Benner* (1988), 40 Ohio St.3d 301, 533 N.E.2d 701; *Wissing v. D.F. Electronics, Inc.* (1997), 1st Dist. No. C–950915, 1997 WL 598405.

**13.** See *Stinson v. England* (1994), 69 Ohio St.3d 451, 633 N.E.2d 532, paragraph one of the syllabus; *Furnier v. Drury*, 163 Ohio App.3d 793, 2004-Ohio-7362, 840 N.E.2d 1082, at ¶ 16.

likelihood that it produced the occurrence at issue."[14]  "At a minimum, the trier of fact must be provided with evidence that the injury was more likely than not caused by defendant's negligence."[15]  The guardians met that minimum.

{¶ 23} Dr. Schouten testified that if the skin had not been cleaned, it would have increased the likelihood of contact separation, and that a failure to clean in conjunction with the presence of oil or cream on the skin would have further increased the likelihood of contact separation.  In fact, three of the five explanations propounded by Schouten attributed the separation to negligence—and not to electrode failure or to a manufacturing defect.  Also, Schouten answered the following question on cross-examination:

{¶ 24} "[Defense Counsel] Mr. Joseph Dilts:  Dr. Hawkins could have done everything completely right and if there was a failure of the adhesive, of the [electrode], this might have happened anyway;  * * * [and] from a physician's point of view, it's possible to have done everything right and not know that there's any kind of problem with going ahead and delivering the electrical stimulus?

{¶ 25} "[Plaintiff's Expert Witness] Dr. Ronald Schouten:  Possible, but unlikely."

{¶ 26} Said otherwise, Schouten testified that if Hawkins had done everything correctly, it was *possible* but *unlikely* that the injuries had occurred from a manufacturing defect or a product failure.  Consequently, when viewed in its entirety and taken to its logical end, Schouten's testimony was that the electrode separation and resulting injury were more likely than not caused by negligence (failure to clean, improper preparation, or improper application).

{¶ 27} Thus Schouten's testimony was important in two respects:  first, it established a plausible theory of causation based on the fact that even Hawkins did not recall whether he had cleaned Hisle's skin with "saline or nothing"; second, Schouten's testimony showed that Hawkins's assigned causation (product failure or manufacturing defect) was improbable.  We are convinced that the evidence supporting the guardians' negligence claim was sufficient to overcome Hawkins's summary-judgment motion.  The guardians' expert presented a theory of liability and used the facts of the case to raise an issue of material fact as to causation that precluded summary judgment.  Hawkins, on the other hand, merely presented a plethora of possible and speculative causes in his defense, without citing any supporting facts or evidence;  and in light of Schouten's

---

14.  See id. at paragraph two of the syllabus.

15.  *Shumaker v. Oliver B. Cannon & Sons, Inc.* (1986), 28 Ohio St.3d 367, 28 OBR 429, 504 N.E.2d 44.

testimony, this minimal defense did not entitle Hawkins to summary judgment—especially when there was no evidence supporting the position that the electrode was defective.

{¶ 28} We hold that the evidence, viewed in a light most favorable to the guardians, created genuine issues of material fact, and that summary judgment was improper. Accordingly, we reverse the trial court's entry of summary judgment for Hawkins, and we remand the cause for further proceedings consistent with the law and this decision.

Judgment reversed
and cause remanded.

HENDON and WINKLER, JJ., concur.

RALPH WINKLER, J., retired, of the First Appellate District, sitting by assignment.